Thank you, Judge Clifton, and may it please the Court. I'm Kathleen Sullivan for the Plaintiff and Appellant, Steve Sanders. The only issue before you on this appeal is whether to reinstate the complaint that the District Court dismissed so that Mr. Sanders will have an opportunity to try to develop facts to support our allegations that the Master Settlement Agreement, together with California's implementing statutes, the escrow and contraband statutes, create an output cartel in restraint of trade. Now, Your Honors, I wanted at the outset to distinguish two different theories on which our allegations allege an output cartel. The first is that together, the Master Settlement Agreement plus the implementing statutes create a hybrid restraint in restraint of trade. And as to that theory, there's no need to prove that there's been any actual agreement since the Master Settlement Agreement was adopted. We also allege a second theory, which is quite clear from the allegations that are in the excerpts of Record 14. Our second theory is that if you don't buy the hybrid restraint theory, we should at least have the chance to go back and develop on the facts, facts to show that there was conscious parallelism among the original tobacco manufacturers after and as a result of the Master Settlement Agreement and the statute. So there's two different theories, hybrid restraint, in which agreement is not required, and conscious parallelism, in which we submit at a minimum we should have a chance to develop facts showing that there were additional factors giving rise to an inference that parallel price rises were intended. Now, there's no dispute here that there was parallel pricing. There's no dispute here that there is no active supervision of that pricing. In this case, there's no rent stabilization board, as there was in Fisher v. City of Berkeley. There's no city taxicab commission. There's no state utility commission. There are no state actors that are supervising the price rises that we contend represent a massive transfer of wealth from consumers to producers in violation of the Sherman Act and parallel state laws. But there is supervision of the settlement agreement, right? If the cigarette companies fail to make their payments as required under the settlement agreement, I assume that the state would roll into action and ensure that they were enforcing the agreement. That's correct, Your Honor, but that's not the kind of supervision that the MidCal line of cases requires. What the MidCal line of cases says is if the state is going to carve a set of private market decisions out of the antitrust laws, it has to actively supervise the activity that causes the anticompetitive harm. And here that activity is not the payment to the state. The activity that causes the harm is the setting of the prices that we contend, the original participating manufacturers, are doing in lockstep. But the settlement agreement doesn't require any price rises. The settlement agreement only requires paying the state funds. So the state is supervising the specific requirements under the settlement agreement. So I'm unclear why the MidCal line of cases, which is a state statute that specifically says you guys go set prices and we won't look, is applicable to the settlement agreement. Yes, Your Honor. We contend that this case is very similar to the MidCal line of cases, even though the statute does not require the posting of the price. What we contend is that the hybrid restraint here is the functional equivalent of a price-posting statute. And to explain that, Your Honor, let me remind you that the master settlement agreement and the enforcing statutes have three main parts. First, they penalize price rises – sorry, they penalize price discounts by the original participating manufacturers by saying, well, if you discount your prices in relation to your competitors, we're going to make you pay a higher share of the historical liability we've distributed through the payments to the fund. Even taking that allegation on face value in the complaint as we must on 1236, all that says is the prices and the market shares would all stay the same. Nothing requires – in the settlement agreement, nothing requires price rises. Your Honor, first of all, the MidCal line of cases does not require the statute to mandate price rises. What the MidCal line of cases forbids is a non-market mechanism like a state statute that either mandates or permits anti-competitive behavior. And what we're arguing here is that even though the statute doesn't mandate a price rise, it virtually inevitably will result in them. And let me explain. There's two more parts to it, Your Honor. The relative market share adjustment says that if one OPM raises a price, the others will be penalized if they don't raise their prices, too, because they'll pick up an additional obligation to pay settlement payments to the state. But there's two other parts. That works only if they pick up additional market share. That's correct, Your Honor. If they pick up additional market share, it's rarely considered bad by a company. In this case, Your Honor, it rarely is. And that's exactly why this is an output cartel. Here everybody is behaving without their usual economic motives. And there's two other key parts to the scheme that show why that's so. Usually an oligopolist is threatened by the possibility that new entrants will come in if he raises prices and take away his market share. There's a limit to how much oligopoly rent he can obtain. Here the scheme ensures that you can't have any new entrants to take away the market share of the OPMs. There's two other sets of provisions. The small tobacco manufacturers, the subsequent market participants, SPMs in the language of the agreement, they get clobbered if they increase their market share through price discounting. If they're grandfathered, they're going to go off the cliff and lose their dues holiday if they increase market share to above 1998 levels or 125 percent of their 1997 levels. And if they enter the agreement, we've alleged, excerpts of record, page 9, footnote 1, if they enter the MSA, we allege that they're being charged a punitive share, a disproportionate share of the settlement obligations. So small competitors who existed in 1998 got clobbered twice by the scheme. And then the key feature here is really the prohibition of new entry by non-participating manufacturers, those who try to come into the market after 1998. And what the states have done here, Your Honor, and this makes it quite like the price posting statutes in MidCal and 324 Liquor, here the state has said if a non-participating manufacturer comes into the market, it wasn't responsible for that historical liability that was divvied up among the OPMs. It's just come into the market. It hasn't hurt anybody yet and it hasn't been sued by anybody yet. But still, the non-participating manufacturer, if it dares to compete in the market, it's going to have to pay escrow into the state account in a measure, in amounts that we contend are prohibitive. Let me ask you about those statutes for a moment. Looking at, if we looked at the statutes separately from the MSA, and I know that the briefs refer to it as the MSA scheme, the statute and the MSA agreement, but looking at the statutes separately, I was trying to see why those would be preempted by the Sherman Act. Why those two statutes, just standing alone on their face, which require the non-participating manufacturers to escrow funds that they may get back eventually if it's determined that they're not causing health problems, why those two statutes standing alone constitute a per se violation of the Sherman Act. Can you address that? Yes, Your Honor. They enforce the output cartel. Now, it's not disputed here, it couldn't be disputed here, that output restrictions are per se violations of the Sherman Act. That's been clear law since Capitol Hill. But you're saying they can't stand alone. You have to look at them in conjunction with the passenger settlement agreement. But that's identical, Your Honor, to the posting, the statutes at issue in Midcal, where the statutes at issue in Midcal got their force as hybrid restraints, was not from the posting. The posting went on, and if a producer posted a price that wholesalers then had to follow or if a wholesaler posted a price that retailers had to follow, the bite in the hybrid restraint came from the fact that the State was going to punish anybody who dared to post a lower price. Our contention is here that the escrow and the contraband statute have the identical effect. They punish, on pain of criminal penalty after the contraband statute, anyone who seeks to sell without paying escrow amounts into the State fund that we contend are prohibitive. We've alleged, and as you said, Your Honor, you have to take these allegations as true for purposes of the 12b-6 dismissal. We've alleged that those increased escrow payments that we have to pay, sorry, that nonparticipating manufacturers have to pay, that those escrow payments fence people out of the market. And that's exactly what the Court was concerned about in cases like MidCal, in cases like 324 Liquor Mart. There was vertical resale price maintenance, but the anti-competitive effect that had is it meant that the wholesalers couldn't compete with one another to sell at lower prices. The retailers couldn't compete against one another to sell at lower prices. And here the State has a different kind of hammer, but it has the same result. It says that the new tobacco manufacturers cannot compete against the old tobacco manufacturers who locked in their market shares because the State is going to hit them with these escrow payments. Are there cases, because I think the MidCal cases that I saw, all of these provisions were in a statute, something that had been enacted by the State legislature. I don't recall one where there was an interaction between a statute with a settlement agreement. Is that correct, or are there? Your Honor, there are cases that find State action to be anti-competitive where there's been a consent judgment. The BMI case about music licenses is an example. So the peculiar cases that arise under the liquor, the structure of the liquor markets, do involve statutes because those, that market is heavily regulated. So this is a kind of combination of the BMI-type case with the liquor-type cases. But, Your Honor, the key feature here that I want to focus on is the barrier to entry, because that was really what the hybrid restraints were doing in the MidCal line of cases. What the Court was, what the State was doing, which was held to be preempted by the Sherman Act and a violation of the law, was the State was, in a sense, protecting output cartels, protecting noncompetition between people in the same tier of the business. It was guaranteeing that no wholesaler could undercut another wholesaler, no retailer could undercut another retailer. And here, no tobacco manufacturer, no matter how cost-efficient, no matter how innovative, is allowed to come into the market and undercut the old companies without facing a prohibitive payment of escrow payments. And, Your Honor, they're not even tax-deductible. Not only do we contend. Well, because they get the money back, though. I mean, that's the difference between paying the damage fee. Not immediately, Your Honor. That does you no good if you're fenced out of the market and you never get started. I'm not monopolizing the questions here, but taking the settlement agreement by itself, because when the parties entered into the settlement agreement, there was no guarantee that the State legislature would enact these two statutes. And so, in fact, the settlement agreement doesn't keep out the nonparticipating manufacturers lose money, then their payments into the system will be lessened. So, in fact, assisting with their competitiveness in the California market. If I just take the MSA by itself, not looking at the two statutes, does that itself constitute a violation of the Sherman Act? Could you address that? Yes. We believe the MSA by itself creates such an obvious incentive for the States to enact the statutes. The tobacco companies wouldn't have entered into the agreement unless they thought they could protect the market share. And the States all did follow suit. There are very strong incentives in the MSA. So we believe you could go to the four corners of the MSA and agree that our hybrid restraint theory should proceed. But that's not this case. In this case, you have clear evidence that California has followed that set of incentives. And let's focus on what the incentives are. Remember that if California allows the big four, now the big three tobacco companies, to lose any of their individual market share, California might lose revenue because California will lose up to three times the amount of lost market share in payments from the OPMs if the competitors succeed. So this is a case in which I want to focus on what's so distinctive about this case and what's so in need of active state supervision of pricing. First, this is a tight oligopoly among four, now three, main producers that as evidence in the record suggests, the evidence we've submitted surrounding the FTC reports regarding the 1997 legislation that was never enacted, the cigarette industry is a classic oligopoly that's been able to pass on price increases in excess of cost increases for a long time. Second, you now have barriers to entry imposed by the states through the contraband and escrow statutes that say no new competitors can come in and threaten the oligopoly because we're going to set the price of entry so high that they can't compete. It's as if you locked in the four biggest early law firms in California and said no new law firms can be set up, or if any new law firm gets set up, it has to pay in such a high price to the IALTA fund that it won't be able to get started because a new law firm can't charge $650 an hour the way the old law firm does. So the barrier to entry feature is critical, and that comes from the statutes. The third key feature here is the state is a co-venture. The state has an incentive to keep the market shares of the original participating manufacturers going because there's a penalty to the state fist if, heaven forfend, any new competitor comes into the market and undercuts their market share. That's what the volume adjustment and the NPM does. The NPM undercuts with money into the escrow fund, which presumably the state will try to cherry pick down the road. That's right, Your Honor. But when it antes up money into the escrow fund for matching the historical liability of the old companies, even though it wasn't responsible for that liability, this is not an excise tax imposed across the board on all cigarettes. There are differential prices imposed on OPMs, SPMs, and NPMs. But once it escrows that money, and our claim, which you do have to credit on a 12b6 motion, our claim is that that amount is prohibitive, that it's too high for us to enter the market, and the non-tax deductibility only accentuates that problem. If there are no further questions, I'd like to reserve the remainder of my time. Thank you. I'm sorry, Your Honor. Was there a question? One more question. Taking the MSA and the statutes together, if we took them as one common scheme, as is expressed by the briefs, I still have trouble seeing why that's a per se Sherman Act violation. If we applied the test that we would under Rice, there's nothing that jumps out as price fixation. Yes, Your Honor. Our argument is it's the functional equivalent of price posting. This is better than price posting. It's better than OPEC. You don't have to get together and agree. Under this scheme, because new competitors are fenced out by the hammer of the State, because new competitors can't come in and undercut you, if one oligopolist raises his price, it's a signal that allows all the other oligopolists, the OPMs, to raise their prices in lockstep, assured that no new competitors can come in to undercut it, and assured that they won't lose market share as a result. So this allows everything a price posting does without the technical formal price posting. It sends all the same signals. And the key, Your Honor, is the State is there to make sure that no new competitors can come in and undercut the oligopolists if they go too far. And so we do allege that it's one scheme. But in the alternative, Your Honor, if you don't credit the hybrid restraint, we at a minimum should be allowed to go back and at least take discovery and find facts about whether there are additional factors here from which we can infer that the parallelism, which is undisputed, is conscious. But we don't need an agreement. Is the agreement the MSA? We don't need an agreement for the hybrid restraint theory as freedom holdings for the conscious parallelism. But if it's something, you can point to it to get a violation of Sherman 1. That's right, Your Honor. But on a 12b-6, we haven't even been given the chance to make discovery of inter-firm communications after the MSA of motive, which is a plus factor under this Court's precedence. So it isn't simply the MSA that you're pointing to? That's correct, Your Honor. No, no, no. We would need to show additional evidence. What we object to on our second theory is we haven't been given a chance to develop a factual record by being dismissed on the pleas. Thank you. I'll reserve the balance of my time. May it please the Court, Karen Lathe appearing on behalf of Attorney General Edmund G. Brown, Jr. I have agreed to split time with co-counsel. I am going to take eight minutes, and my co-counsel will take 12.  I'm actually feeling a little sick today. The State's position in this appeal is that Sanders' three preemption claims against my client were properly dismissed because the challenged California statutes do not irreconcilably conflict with the federal antitrust law, and the so-called MSA scheme is not a hybrid restraint. Instead, the challenged statutes and the MSA provisions that Sanders challenged constitute straight, direct state action by the State of California that is simply not governed by federal antitrust law. We have to begin by applying the Rice Standard, which mandates that a state statute is potentially preempted if and only if it irreconcilably conflicts with the Sherman Act. Such an irreconcilable conflict exists only where the statute either mandates or authorizes conduct that necessarily constitutes a violation of federal antitrust law in all cases or places irresistible pressure on a private party to violate federal antitrust law to comply with the state statute. The California laws that Sanders challenges do nothing of the sort. They merely require tobacco manufacturers to make certain payments, either into escrow as security for potential liabilities or directly to the states in settlement for the liabilities settled by the master settlement agreement. They do not authorize or mandate any tobacco company to collude on price or output or engage in any other behavior that is per se forbidden under federal law. We're at the stage of a motion to dismiss, but take a step back. You quarrel with the proposition that this package does provide some incentive for cartel behavior. For purposes of a motion to dismiss, we're prepared to accept the notion that the plaintiff has alleged that this scheme. I don't mean to get intercepted factually. No, but for purposes of the analysis at this point, one can accept the notion that there are economic incentives built into the system. We don't believe that they exist, but you can accept that notion and affirm. Can the state enact a statute that creates, I'll use the shorthand, and I understand the factual contest will be down the road if we get there, but can the state create cartel incentives? Absolutely, if it is direct state action, that's right. The state can always step into the marketplace, this is the central teaching of Parker, and regulate in ways that have anti-competitive effects, it happens all the time. Does Parker require more than just the creation of incentives? Does it require ongoing regulation of some kind? Parker requires that the action be the action of the state. To the extent that you are in a realm where there's some uncertainty as to whether or not the action is that of the state, then you're in a realm of potential hybrid restraint. Suppose, let's go back to Parker. Suppose the state had decided that, you know, we've got a real problem with output, which was a problem in the agricultural industry, so we're going to say nobody can produce raisins except these three companies. Can the state do that? The state can do that. The state can do that, even though it may have an adverse effect on the marketplace. The only thing that the state can't do is what is said in MidCal, cast a glossy cloak over anti-competitive behavior of private parties, and in some fashion insulate private parties from liability under federal antitrust law. And their point is that that's what is in fact happening, because the state is not supervising. It creates the incentive and the ability. It facilitates the tobacco companies to raise their prices, but it's not supervising the price raisings. Why isn't this the functional equivalent of price posting? I don't know what you mean by the functional equivalent. That is a concept that my opposing counsel has created, that I find no foundation in the law. The law requires for preemption that there be a clear, unmistakable conflict, irreconcilable conflict. And we don't look at the potential anti-competitive effects. We look at whether or not there can be a — If I read the statutes with the MSA as if the MSA were part of the statute or incorporated by the statute, and taking the allegations in the complaint, there does seem to be a basis to say the — read together, the scheme divides the market. It keeps market shares of each company and all the new entrants the same, because there is a penalty, wipe out the profits, that's the allegations, if any of the current players in the system increases their market share. So can you address, assuming that the function of this scheme working together is to ensure that all market shares stay the same, does that raise a Sherman Act violation? The Sherman Act violation arises only if on its face there is an irreconcilable conflict and there isn't any such thing. All these statutes do is require certain payments and perhaps create certain incentives. But it does not allow any tobacco company to collude on price, restrain output, and if they did that, they would find no refuge in the Master Settlement Agreement or in the legislation. They would not — So your position is basically the State can set the table, but that doesn't mean anybody is going to sit down and have a meal. Even if the incentive is great to sit down and have a meal, the State is allowed to set the table? I guess the State is allowed to set the table, and if the tobacco companies collude, they're subject to the full force of the federal antitrust law. I see I've used up my time. Thank you. Good morning. May it please the Court. Daryl Snyder for Philip Morris USA and arguing for the manufacturer defendants. I just want to say about 30 seconds on Norah Pennington, which was not even mentioned by the plaintiff here. And I think the reason it wasn't mentioned is clear. The agreement here, which is the MSA, and that's the only agreement alleged in the complaint, cannot serve as the agreement for Section 1 purposes because they have conceded that it's immune. All 11 judges looking at MSA challenges in the past, including the Third Circuit and the Tenth Circuit and three district court judges in this circuit, have all concluded the same thing, which is that the manufacturers are immune from liability under Norah Pennington for all the claims in the case. Having said that, I'd like to move on to... I think you'll agree that that protects through the agreement but does not rule out the possibility that they have conspired, agreed, or in some other fashion violated Section 1 with post-agreement behavior. Yes, we still need to go on and analyze the complaint and look at that, and it's certainly possible that there could be some behavior after the agreement that would not be protected by Norah Pennington. That's not the claim here. The claim here is that it's the MSA itself that is the agreement. Even if you assume all the allegations of the complaint to be true, the state action immunity doctrine under Parker requires dismissal of all claims asserted in this complaint against the state and the manufacturers. And the reason is is because under our system of federalism, the state can displace competition. Under Parker, the state can come in and adopt a statute or enter into a settlement even if it is anti-competitive. That's what the Supreme Court says in Rice. Even if it is anti-competitive, that's not the test. There's only two exceptions, narrow exceptions to this immunity, and those two exceptions are private restraints and hybrid restraints. They don't contend we have a private restraint here. That would be like if they authorized the companies to go out and fix prices and said you can go out and fix prices, it's okay. That's what happened in Tycor. So we don't have a private restraint. We can set that aside. Then there are hybrid restraints. What is a hybrid restraint? A hybrid restraint is where the state has delegated authority or ceded authority to a private party to set the price and then force other competitors or private parties to follow with the force of law. In other words, there has to be a component of legal compulsion. We only need to look at the only three Supreme Court cases where any hybrid restraint has ever been found to understand this important element of legal compulsion, and that's in MidCal, 324 Liquor, and in Schweigemin. And in each of those cases, it wasn't a case about incentives or whether somebody had an incentive to do this or do that. It was about there was one party who could set the price in MidCal. The distributors, the manufacturers could tell the wholesalers what price the retailers had to charge. And that was backed up by the force of law. And as Judge Ikuda said, that would then require some kind of active supervision. And I think you asked why MidCal doesn't apply here. MidCal doesn't apply here because we don't have any preemption. MidCal only comes into play when, in fact, you have a situation where the statute would otherwise be preempted. It would otherwise be void. And then you would look at MidCal to see whether active supervision can save it. Okay, that's not what we have here. They don't even get to first base because they have not established that there's any preemption. They have not established there's any irreconcilable conflict with the federal antitrust laws. As Judge Rehnquist said in Rice, there would have to be something that would be a first aid violation in all cases. That would be then something that would be preempted. And so you have to go from looking at preemption to these two narrow exceptions and the one that's relevant here is hybrid restraint. Then you have to look at what is a hybrid restraint, and that gets you right into the analysis about whether there's legal compulsion. What is the legal compulsion here? The only legal compulsion here is that the MSA legally compels the OPMs and SPMs, manufacturers, to make payments. They have to make payments in a certain amount. It's not discretionary. It's fixed by the state. The manufacturers have no ability to change it, vary it, or any discretion about it. They also charge these ESPRO contributions or require NPMs, these non-participating manufacturers who are not parties to this agreement, to make ESPRO contributions to the state. But that's the only legal compulsion that's backed up by the force of law in the state of California. That legal compulsion isn't the legal compulsion that the cases are talking about. It's not legal compulsion to make a payment. It would have to be legal compulsion where one private party here could make another party or force another party to follow its price. Not only that, there's been no ceding or endowing of the state's ultimate power here to regulate its commerce, even if it's anti-competitive. Nobody's ceded any authority to the tobacco companies to do that, and we didn't hear her say that. What we heard her say today is that somehow there's an economic incentive that comes into play, and this economic incentive will lead to perhaps in an oligopoly setting, it will lead to supra-competitive prices, which are prices that are somewhat above the perfectly competitive prices. Yes? Assuming that we looked at the MSA and the two statutes working together as if they were one statute, say, why isn't that a per se violation? Doesn't it divide up markets and keep markets protected? No, it does not, Judge Ikuda. And the reason it does not is their output cartel theory here is based purely on these payments and whatever incentives come out of them, but one could look in vain for any facts in the complaint that would actually allege that there is some kind of an agreement to fix prices. The MSA is silent about prices. It doesn't authorize the companies to do anything about prices. So what you'd have to accept is the notion that once the state has affected people's incentives and it affects them in a way that leads to price increases, and even for the sake of argument, conceding that they've alleged that those price increases would be in lockstep fashion, that's not the compulsion that the courts are talking about. If you look at the language in Rice, for example, and in Fisher, they talk about the requirement or compulsion to violate the antitrust laws, not the requirement or the compulsion to raise prices. And as is clear from Supreme Court law in Brook Group, which involves this industry, and the Eleventh Circuit's opinion in Williamson, which involves this industry in this time period, including conduct after the MSA, there has been no conspiracy with respect to setting prices. Now, that's a matter of fact, and we're on a motion to dismiss. But the point is, even if they had alleged conscious parallelism, that would not be enough. And they haven't really even alleged conscious parallelism. That's her second theory today, because I think she perceives that hybrid restraint is going down the tubes. So now they're switching over to, well, what about conscious parallelism? All we have to look at are the following cases to know that that is not going to be sufficient to state a claim, and therefore it should be dismissed. If you look at Judge Breyer's opinion when he was on the First Circuit in Clampville, if you look at Brook Group and if you look at Williamson Oil in the Eleventh Circuit, Judge Marcus, they made it clear that conscious parallelism was not enough. And the argument was even made that certain activity created incentives and facilitated price coordination and the increasing of prices. That was not enough. So that theory really gets them nowhere. It was never really mentioned in the complaint. It was not mentioned in the lower court below as such. And so we come back to the fundamental notion that the only agreement that is alleged in this complaint is the MSA itself and the two statutes that the State has enacted. That is clearly State action. It's direct State action in the sense of what Justice Powell said in Hoover and what this Court said in Charlie's Taxi, direct State action. Moreover, it doesn't fit within these two very narrow exceptions. This does not fit the hybrid restraint exception. And it doesn't fit it because there's no element of either ceding authority to a private party on price or on legal compulsion. And after all- Is there a point at which incentives can be stacked high enough to do the functional equivalent of compulsion such that the law should recognize incentivization or disincentivization as equivalent to compulsion? You can say to somebody, you can charge a different price, but we're going to make you pay this other thing instead, for example, which I think is what the allegation is here. I think the allegation here, if I understood your question clearly, Judge Clifton, is that the allegation is that all the MSA does is impose these payment obligations. And then that affects- Well, I think the allegation here reflects or speaks to barrier to entry. Plaintiffs are alleging that, sure, you can enter the market, but the price tag that we've attached to that is so high that it's unrealistic. And I'm not asking you to obviously adopt that theory, but I'm wondering, you've got the line of compulsion, legal compulsion. Right. Is there a point at which the state could create incentives or disincentives that are the functional equivalent, but because it's not compulsion, you would say. You say that's on the other side of the line, that the state would do that. Well, I mean, I can imagine a lot of scenarios, and one could be creative and create something that is virtually tantamount to a price-fixing conspiracy by using different words, but that's not what happened here, and it's not what's alleged here. First of all, in their brief, they admitted, page 17 of their reply, that legal compulsion is the hallmark of a hybrid restraint. Secondly, they don't even allege in their complaint that the NPMs can't enter the market and that these barriers to entry are so high that all other competitors are excluded. That's not their claim. Their claim in the complaint is that these incentives have been created that require people to pay approximately two cents per cigarette. Let's keep in mind that one of the things that is also part of the MSA is that the NPMs, these non-participating manufacturers, the so-called smaller little guys that she's concerned about, they never have to pay more than a non-grandfathered SPM or subsequent participating manufacturer. They never have to pay more than that. If, in fact, more has been collected from them and they made a greater contribution into the escrow fund, they get it back. More importantly, we're talking about a violation of the antitrust laws here. Even if there is just competition at the OPM level, at the manufacturer level of the largest companies, as long as they have an incentive to compete, which they do, and that incentive has not been eliminated, which it is not by just making these payments to the state. They're going to compete with one another. They allege it's eliminated. They allege that the payments essentially eliminate their profit, so there's no point to compete by price. Well, let me deal with that directly. Thank you, Your Honor. In one place they say the word eliminate. In another place they say the word lessen. They try to fudge it. But here's the most important point. The most important point is that in this theory that they lay out with respect to the relative market share adjustment, and that's their main theory. In fact, that's what they admitted down below. They said if the relative market share adjustment worked out so that it was imposing a flat cost per cigarette, it would be neutral as to competition. Those are their words, not mine. Neutral as to competition. They admitted that below. And, in fact, it makes sense. And so another alternative basis for affirming the decision below is what we have said is the MSA itself is incorporated by reference. It's part of the pleadings for all purposes under Rule 10C. And, in fact, it doesn't work the way they say it works. Now, we win on Norr Pennington and state action as a matter of law, even if you assume that everything they've said about the MSA is true. We win on those two anyway. But now I'm coming to a third point, which is, one, the court should not just accept without at least comparing and reviewing the MSA and what they say about it in the complaint. The court's obligated to look at it. And, in fact, if the MSA terms refute their allegations under both Roth versus Garcia in this court and Zimumra in the Tenth Circuit, the court is not supposed to accept those allegations as true. So we made this an important part of our brief on opposition at pages 9 through 11. We went through an example. We showed how the relative market share adjustment does not work as they say it does. And they were silent in their reply. They have completely dropped it. They've abandoned it. And we didn't even hear an argument today. We heard an assertion. And, of course, assertions and legal conclusions are not part of a well-pleaded complaint. The test on a 12 v. 6, obviously, is to look at the complaint itself and the factual allegations that are made. That's a conclusion to say that it eliminates competition. They have to allege facts that, you know, would lead to the elimination of competition. And that they have not done. And, secondly, their key theory, this one that I just described as being the one that they were basing virtually this entire case on, they've dropped. And so now today for the first time we hear this new conscious parallelism theory, you know, at the appeal stage. Never really litigated in the record below. But even if it were, it doesn't take them anywhere, as I said before. Finally, just I know I'm over. I just wanted to point out that the state law claims also need to be dismissed for the same reason. Because, obviously, the State of California knew about the Cartwright Act when it entered into the MSA and it passed these statutes. And there's no presumption that somehow it intended to preempt its own statute. Thank you. Lottle. Thank you, Your Honors. I'd like to begin by reminding us that this is a 12B6 dismissal, as Judge Acuto pointed out earlier. And I don't know what complaint my opponent has been reading, but if I could just refer Your Honors to the excerpts of record at page 13, it couldn't be more clearly pleaded that the NPMs have been fenced out of the market. On excerpts of record page 13, paragraph C, we allege the escrow payments required of NPMs are greater than the amount of profit an NPM earned at pre-MSA price levels, and tax deductibility increases that. So, yes, we did allege that the legal compulsion, Your Honor, is that new competitors are fenced out. And that legal compulsion is every bit as compulsive as in mid-count. The point is that the pre-MSA price levels don't stay there. In fact, if you have super competitive pricing, then there's all sorts of profit or other revenue for the NEM to try to collapse. That's correct, Your Honor. But for the new competitor, he has to absorb a share of the old competitor's cost structure. He has to absorb the cost structure of the old competitors before he can even get in, and that is prohibitive. But at the level of the complaint, all we have to do is allege it, and we have. As to our so-called new theory, the conscious parallelism theory, again, it's well pleaded in the complaint. If you turn the page to excerpts of record page 14, the section denominated in the complaint, the MSA's anti-competitive effects, paragraph 29 is devoted to stating and objecting to the way the tobacco defendants have used the MSA to set prices in parallel. So that claim was pled. It's not a new theory. It's not a problem of the agreement. I know we're taking you over, but we need the help, so I'll take you over. Thank you, Your Honor. In some place, there's going to have to be an agreement. That's right. If it's not the MSA itself, and I take it you've acknowledged that the MSA isn't going to be the agreement, what is? Subsequent tacit agreement, as recognized by this Court in cases like the petroleum products litigation, and we need not plead in the complaint what the additional plus factors are that will help us show that agreement. What we're asking for is the chance to show them. On page 16 of our gray reply brief, we cite to the Twombly case, which reminds us that we can try to prove conscious parallelism on discovery in a trial, even if we haven't been able yet, because we haven't had discovery yet, to say what they are. We're entitled to look into non-Norr-Pennington protected communications among the firms after the settlement. We're entitled to look into motive, and we're entitled to look into behavior that doesn't conform to ordinary individual economic incentives. Your Honor, if I may go over just two quick points. Your Honor, you're quite correct. I was shocked to hear the State say that the State could create a raisin cartel, create three raisin sellers, and not supervise their prices. If it didn't supervise their prices and a consumer couldn't object when the price of raisins went through the roof, active supervision is the hallmark of State-exclusive franchise arrangements. My opponent referred to Charlie's Taxi. Charlie's Taxi gave an exclusive franchise to a taxi company to drive from the Honolulu Airport to downtown, and the City supervised the prices. That's true of utility regulation. It's true of taxi regulation. It's true of common carrier law. The notion that the State could create a cartel and not supervise the price, its prices, has no support. And the State was unable to cite a single case suggesting that proposition. And finally, Your Honor, as to the Judge Clifton and Judge Akuta both captured the point exactly when you said this is the functional equivalent of an output cartel. In Judge Clifton, you said the State has set the table and invited the tobacco companies to eat. But the key feature here, Your Honor, is the State is sitting down at the table to share that feast. And as long as that's true, the State is going to have an incentive to trade competition policy off in favor of its revenue stream and not to protect the people. And one more feature. This agreement is in perpetuity. If you look at the excerpts of Record, page 89, this is a – nobody can ever undo what Attorney General Lockyer did to the State and Attorney General Brown now defends. It can never be undone. It's not like a 15-year franchise in Charlie's Taxi. There's no chance for the people to come in and try to pull back the tobacco companies from these anticompetitive price hikes, $4.50 the first day, $7.50, $7.50 additionally by 2002. So those features, the State as market participant, the fact it's in perpetuity, the fact that there was an oligopoly recognized by the FTC preexisting this MSA, and the fact above all that there is the legal compulsion of State hammers against new competitors make this the kind of carve-out from the antitrust laws that absolutely requires active supervision of the prices. There is none. We should be able to proceed on both theories. Thank you very much. Thank you. If I could say, the three-to-one, we'd just urge you, Your Honor, if I could. I'm so sorry. If we could urge you to join the three-to-one majority of your sister circuits who have held our way with respect to the hybrid restraint theory and the Parker v. Brown theory, we'd be very grateful. Thank you again, Your Honor. Thank all counsel for the arguments. The case is submitted.
judges: B. Fletcher, Clifton, Ikuta